UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON

CIVIL ACTION NO. 05-73-DLB

TINA HONICAN                                                                                                PLAINTIFF

vs.                              **MEMORANDUM OPINION AND ORDER**

STONEBRIDGE LIFE INSURANCE
COMPANY and JC PENNEY LIFE
INSURANCE COMPANY                                                                           DEFENDANTS

***************************

## I.   INTRODUCTION

Plaintiff, Tina Honican, brings claims for breach of contract and bad faith by Defendant insurance companies, Stonebridge Life and JC Penney Life (collectively "Defendants"), for their denial of coverage. Plaintiff is the beneficiary of an insurance policy purchased through Defendants, which was held by the deceased insured, Addie Anderson ("Ms. Anderson"). This matter is presently before the Court upon Defendants' Motion for Summary Judgment (Doc. #19). Plaintiff filed a Response (Doc. #22) and Defendants filed a subsequent Reply (Doc. #26). Therefore, the motion is ripe for the Court's review.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

This case involves an accidental death insurance policy (the "policy") issued by Defendant Stonebridge to Defendant JC Penney for coverage under a master group policy, which was then issued to Plaintiff's mother, the insured, Ms. Anderson. The insurance policy provides coverage for "injuries," which are defined as "accidental bodily injuries

sustained by the [insured] which are the direct cause of Loss, independent of disease or bodily infirmity...." To the same effect, the insurance policy also excludes from coverage any injury "due to disease, bodily or mental infirmity, or medical or surgical treatment of these."

On January 9, 2004, Ms. Anderson, 75 years old at the time and living with Plaintiff, fractured her hip in an accidental fall. She was admitted to St. Luke Hospital West in Florence, Kentucky on the same day. According to Ms. Anderson's discharge summary, and as testified to by her attending physician, Dr. James R. Schrand ("Dr. Schrand"), Ms. Anderson could not be immediately cleared for surgery on her hip upon admittance to the hospital because her health condition, independent of the hip injury, was so poor as to require certain preparatory procedures. Ms. Anderson was suffering from, among other things: minor heart failure, possible pneumonia, a urinary tract infection, coronary artery disease, diabetes type II, hypertension, edema, dementia, and left-sided weakness from a stroke (or "CVA") she suffered in 1996.

Surgery on Ms. Anderson's hip was eventually performed four days later on January 13, 2004. The post-operative report completed on the same day indicated that there were no complications in surgery and that Ms. Anderson "tolerated the procedure quite well." Nevertheless, Ms. Anderson subsequently suffered a "massive" stroke only a day later on January 14, 2004, which rendered her unresponsive. She passed away that same day, in accordance with the terms of her living will.

As Ms. Anderson's beneficiary under the insurance policy, Plaintiff made application to Defendants for benefits in February of 2004. In a letter to Dr. Schrand sometime after Ms. Anderson's death, Plaintiff requested that Dr. Schrand state in the Death Certificate

and the "Proof of Death – Attending Physician's Statement" (a form required by Defendants) that Ms. Anderson's death "started with the fall." After incorrectly assuming, according to Defendants, that coverage benefits would be provided if only Dr. Schrand would state that Ms. Anderson's death "started with her fall," Plaintiff asked Dr. Schrand "if [he] would please complete the form and remember to state that it was the fall that was the reason for [Ms. Anderson] being admitted, she went through surgery, and later died of a stroke...."

Despite Plaintiff's requests, Dr. Schrand certified in Ms. Anderson's Death Certificate that the "immediate cause" of her death was the stroke suffered the day after surgery. Although the Death Certificate form solicited up to four causes of death, Dr. Schrand chose to list only three: "(1) CVA – cerebral infarct;[1] (2) prior CVA;[2] and (3) cerebral vascular insufficiency."[3] Notably, Dr. Schrand did not list Ms. Anderson's accidental fall, hip fracture, or subsequent surgery as the fourth "immediate cause" of death. Instead, he elected to include conditions related to Anderson's hip in the portion of the Death Certificate that solicited factors which contributed to Ms. Anderson's death, but did not directly cause death or even "result[ ] in the underlying cause." Dr. Schrand further indicated that Ms. Anderson's diabetic condition was "an immediate, underlying, or continuing cause of or

---

[1] CVA is an acronym for "cerebrovascular accident," a medical term generally encompassing a stroke and cerebral hemorrhage. According to Dr. Schrand, he was referring to Ms. Anderson's post-operative stroke when he wrote "CVA – cerebral infarct" on the Death Certificate.

[2] Dr. Schrand's indication that Ms. Anderson's "prior CVA" was as an additional cause of death is a reference to her stoke suffered in 1996, which left her with continuing health problems.

[3] During his deposition, Dr. Schrand explained what he meant by cerebral vascular insufficiency: "...her prior CAT scans would confirm that she had insufficiency in her arteries, arterial sclerotic changes in her arteries in her head which can lead to a blood clot forming and precipitating the stroke."

condition leading to death." In his deposition, Dr. Schrand elaborated that the diabetes increased Ms. Anderson's "cerebral vascular insufficiency and atherosclerosis, which eventually caused her to have the stroke."

In the "Proof of Death – Attending Physician's Statement," which was completed and signed by Dr. Schrand on February 3, 2004, it is apparent that Ms. Anderson's death was brought on by a variety of conditions, including her post-operative stroke, her fall and hip fracture, her diabetic condition, and the lasting effects from her 1996 stroke. Although Dr. Schrand's response to the first question on the form somewhat contradicts his statements on the Death Certificate, answering that the primary cause of death was the fall and hip fracture, Dr. Schrand further clarified during his deposition that while the "principal cause of death" was Anderson's post-operative stroke, her fall "was the primary cause for her to have her CVA," or stroke. Reinforcing this clarification is Dr. Schrand's response to the seventh question on the form, asking whether the fall and hip fracture was "directly and independently of all other causes, sufficient to produce death," to which Dr. Schrand responded: "Injury itself did not cause Death – stroke after surgery."

Based on the information in Ms. Anderson's Death Certificate and the supplemental information and records supplied by Dr. Schrand, Defendants concluded that Ms. Anderson's death was not the result of an "injury" as defined by the insurance policy in that it was not "independent of disease or bodily infirmity." Consequently, Defendants denied Plaintiff's claim for accidental death benefits resulting from Ms. Anderson's death.

Upon denial of coverage, Plaintiff, as beneficiary, filed a five count complaint in Boone County Circuit Court in April of 2004, alleging: (1) breach of contract; (2) violation of Kentucky's Unfair Claims Settlement Practices Act (statutory bad faith); (3) violation of

Kentucky's Consumer Protection Act (statutory bad faith); (4) common law bad faith; and (5) fraud and punitive damages. Plaintiff seeks benefits under the accidental death insurance policy, interest, attorney's fees, pain and suffering, and punitive damages.

On April 20, 2005, Defendants removed the case from Boone County Circuit Court to this Court. Shortly thereafter, the Court granted Defendants' Motion to Bifurcate Plaintiff's contract claim (Count I) from her non-contract claims (Counts II-V), and to hold the latter claims in abeyance until the contract claim was resolved. In granting the motion and subsequently bifurcating the proceedings, it was the opinion of this Court that "a finding that [Defendants] did not breach the insurance contract eliminates the possibility of bad faith" (Doc. #10, p. 4).

### III. ANALYSIS

#### A. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Once the movant has met this initial burden, the non-movant cannot rest on its pleadings, but must show that there is a genuine issue for trial. *See id.* at 324. A dispute over a material fact cannot be "genuine" unless a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the non-moving party." *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 361 (6th Cir. 2001). If a reasonable jury could not return a verdict for the nonmoving party

on the basis of the evidence as construed in its favor, summary judgment should be granted to the movant. *See Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002).

**B.     Breach of Contract Claim**

Plaintiff ultimately and unpersuasively argues that there must be genuine issues for the trier of fact in this case simply because the parties disagree as to whether the insurance policy covers the victim's death. The policy dispute itself does not raise a fact issue for the jury. Such a finding would circumvent the summary judgment process in its entirety. Even if genuine factual disputes do exist in this case, a finding largely unsupported by the record, any such remaining issues are not material to the Court's determination of the summary judgment motion as a matter of law. *See Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

The reality is that the facts surrounding the victim's accident, death, and prior conditions – i.e., the material facts – are not genuinely in dispute. Plaintiff insists that summary judgment is improper because there are still questions surrounding the ultimate cause of Ms. Anderson's death. Although it is difficult to argue based on the record that the stroke was not the direct cause of Ms. Anderson's death, even if the actual or primary cause of death is not definitive because of multiple contributing factors, this has no bearing on summary judgment because the applicable legal standards governing the language of the policy do not depend upon or require the level of certainty pled by Plaintiff. *See id.* ("As to materiality, the substantive law will identify which facts are material."). The only material issue that genuinely remains in dispute is how the circumstances of Ms. Anderson's death

figure into the framework of the insurance policy and the relevant precedent at work. But this is a question of law, not fact.

The essential legal determination in this case, as dictated by the language of the insurance policy and applicable precedent, is highlighted by the parties' conflicting attempts at phrasing the proper "cause of death" inquiry during the deposition of the attending physician, Dr. Schrand. Plaintiff would have the Court believe that the appropriate question is: Would the death of Ms. Anderson have occurred at or even around the same time but for the accidental fall one week earlier? Not surprisingly, Dr. Schrand answered this question in the affirmative because the record demonstrates that the accidental fall was indeed the catalyst that triggered the unfortunate chain of events leading to Ms. Anderson's death.

However, the question as posed by Plaintiff is an incorrect interpretation of the policy coverage because the triggering accident must be more than a contributing factor, it must be the sole cause, at least to the extent the death is "independent" of existing health conditions. More importantly, by relying–still unpersuasively–on a plethora of case law outside the relevant jurisdiction,[4] Plaintiff's approach fails to take into account well-settled Kentucky law addressing identical or very similar insurance policies.[5] Kentucky courts have

---

[4] Although subject matter jurisdiction is vested upon this Court pursuant to complete diversity of the parties, it is undisputed that the substantive law of Plaintiff's claims are governed by the law of Kentucky. *See Brown v. Raymond Corp.*, 432 F.3d 640, 645 (6th Cir. 2005); *Beams v. John Hancock Mut. Life Ins. Co.*, 325 F.2d 887, 888 (6th Cir. 1964) ("Federal jurisdiction had been invoked because of diversity of citizenship, and thus the substantive law of Kentucky is controlling.").

[5] Further reliance on non-controlling precedent is found in Plaintiff's invitation for the Court to expand the insurance policy at issue by positing that the term "proximate cause" has a special meaning "in the context of accident insurance." The Court rejects this invitation for two reasons. First, the phrase "proximate cause" does not appear even once in the insurance policy under

consistently interpreted such contractual language found in other accidental death insurance policies as requiring plaintiffs to show that the claimed accident was the sole cause of the insured's death in order for the death to constitute an "injury" for which coverage is provided. *See, e.g.*, *Commonwealth Life Ins. Co. v. Byck*, 268 S.W.2d 922, 925 (Ky. 1953); *Prudential Ins. Co. of Am. v. Lowe*, 230 S.W.2d 466 (Ky. 1950); *Sachs v. Independence Ins. Co.*, 208 S.W.2d 61 (Ky. 1948); *Prudential Ins. Co. of Am. v. Gaines*, 112 S.W.2d 666 (Ky. 1938). In *Byck*, the Kentucky Supreme Court, commenting on the scope of coverage provided by policy language substantially similar to the language now in question, observed that "[t]he rule is well established that the insurance company is not liable under this type of insurance coverage where the death of the insured is due to his diseased condition or *where death is due both to the accident and to the disease*." *Byck*, 268 S.W.2d at 925 (emphasis added).

Likewise, the Sixth Circuit has observed that Kentucky courts, when called upon to determine the scope of coverage provided by policy language substantially similar to the language now in question, adhere to the following approach:

> The approach of [the Kentucky] cases is to seek to determine whether death was caused by the accident, in which case recovery upon an accidental death clause was allowed, or whether it was caused by a combination of the accident with the pre-existing physical ailment, in which case the accident was not the sole cause of the death and thus recovery was not permissible under the accidental death clause.

*Beams v. John Hancock Mut. Life Ins. Co.*, 325 F.2d 887, 888 (6th Cir. 1964). In a similar

---

consideration. Second, Plaintiff cites to no Kentucky case law supporting a call for a special definition of "proximate cause" in the context of double indemnity accidental death insurance policies with language similar to the policy at issue.

case applying Michigan law, which traces the approach of Kentucky courts,[6] the Sixth Circuit further clarified the proper analysis in these types of cases:

> When a policy insuring against accidental death contains exclusionary language substantially to the effect that benefits are precluded where death directly or indirectly results from or is contributed to by disease, the inquiry is properly limited to determining if the accident alone was sufficient to cause death directly and independently of disease; *an exclusionary clause therefore precludes recovery where death results from a pre-existing disease or from a combination of accident and pre-existing disease.*"

*Ann Arbor Trust Co. v. The Canada Life Assurance Co.*, 810 F.2d 591, 593 (6th Cir. 1987) (emphasis added). Notably, the policy now at issue contains such an exclusionary clause in two different locations, both of which except injuries that are not independent of other health conditions or problems.[7]

Accordingly, the appropriate and ultimately dispositive question for the Court in determining whether coverage exists under the policy is: Would the death of Ms. Anderson have occurred following the accident but for her preexisting medical conditions?[8] The answer, as evidenced in the record, is clearly no. In other words, the coverage burden is

---

[6] In her Response, Plaintiff cites to a case applying Michigan law, effectively recognizing that the approaches of the two jurisdictions, Michigan and Kentucky, are effectively identical. *See Knight v. Bankers Life & Cas. Co.*, 29 F. Supp. 2d 417 (E.D. Mich 1998) (denying summary judgment because there was a genuine issue of material fact, namely whether insured's death was "caused or contributed to by" bodily infirmity, sickness, or disease).

[7] This approach was recently embraced by District Judge Joseph M. Hood within his unpublished opinion in *Sawyers v. Stonebridge Life Ins. Co.*, Civil Action No. 3:03-67-JMH (E.D. Ky., March 19, 2004) (attached to Defendants' Motion as Exhibit 10, Doc. #19-12). In *Sawyers*, Judge Hood granted the defendant's motion for summary judgment because the plaintiff-beneficiary was unable to show that the insured's death was caused solely by the claimed accident, "directly and independently of all other causes." (Doc. #19-12, p. 6).

[8] This is the rough equivalent of Question 7 on the "Proof of Death – Attending Physician's Statement," which states: "Was the [fall and hip fracture] directly and independently of all other causes, sufficient to produce death?" To this question, Dr. Schrand responded: "Injury itself did not cause Death – stroke after surgery."

not on Defendant insurer to show that the death would have occurred regardless of the precipitating accident. Rather, the burden is on Plaintiff insured/beneficiary to prove by a reasonable degree of medical probability that the death would have occurred "independent" of the victim's health problems (i.e., the accident must be the sole cause). *See Byck*, 268 S.W.2d at 925 ("It is an indispensable prerequisite, in order to recover in this case, that appellees must prove not only an accidental injury but that such injury was the exclusive and independent cause of [the insured's] death.").

In viewing the facts in the light most favorable to Plaintiff, Defendants must prevail as a matter of law because Plaintiff has not shown that the death of Ms. Anderson would have taken place as a result of the fall without the existence of the victim's prior medical conditions. Ms. Anderson's accidental fall caused only the need for surgery to repair her broken hip; it was her poor health that resulted in her second stroke and ultimate death following the surgery. If any factor could be considered the primary culprit in Ms. Anderson's passing, it was her myriad of medical problems, not the accidental fall and subsequent broken hip, although such a determination is not necessary for the Court's disposition of the motion.

The aggregation of evidence demonstrating that Ms. Anderson's prior health problems played a part, if not a primary role, in her death is substantial. Dr. Schrand indicated in the death certificate that Ms. Anderson's diabetic condition contributed to her death, because that condition increased Anderson's "cerebral vascular insufficiency and atherosclerosis, which eventually caused her to have the stroke." Similarly, in the "Proof of Death – Attending Physician's Statement," Dr. Schrand stated that Ms. Anderson's death was brought about by a variety of conditions, including her post-operative stroke, her fall

and hip fracture, her diabetic condition, and the lasting effects from her 1996 stroke.

Even the deposition of Plaintiff's own expert, Dr. Andrew Manganaro, reveals that Ms. Anderson's pre-existing health problems played a role in her death. Despite his concerted efforts to trace the applicable legal standards in his statements and to suggest repetitiously that he was unable to know to what degree Ms. Anderson's "co-morbidities" (i.e., other health conditions) were a factor in her death,[9] Dr. Manganaro nevertheless testified that her death was indeed the result of multiple health-related factors:

> Q: And when you talk about these co-morbidities, you're referring to the congestive heart failure, the diabetes, the hypertension, and the other problems [Ms. Anderson] suffered from?
>
> A: Yes.
>
> Q: And those are all contributing factors to, I suppose, her ultimate demise, aren't they?
>
> A: And the broken hip, yes.

Dr. Manganaro also conceded during his deposition, in apparent contradiction with his earlier expert letter, that Ms. Anderson did indeed have a number of pre-existing and active health problems, all of which played some role in her death:

> Q: Do you believe there may have been other contributing factors that led to her death in addition to her fracture and hospitalization?
>
> A: Well, of course she had a number of co-morbidities.

---

[9] Dr. Manganaro's lack of knowledge concerning the degree to which Ms. Anderson's health problems factored into her death is not surprising given the fact that he did not have any records pertaining to Ms. Anderson's health history pre-2004 (i.e., nothing before the accident in question), including her first stroke back in 1996. Furthermore, Dr. Manganaro admitted in his deposition that he only spent a combined two hours reviewing what files were made available to him by Plaintiff, formulating his opinions, writing his report, and speaking with Plaintiff's counsel. Dr. Manganaro's incomplete and at times conflicting testimony (via both letter and deposition) is simply not sufficient to create a genuine issue of fact in this matter.

Q: Such as?

A: Congestive heat failure, diabetes, previous CVA's; and what she died of was a stroke subsequent to the surgery.

Q: In looking at her medical records, I saw a prior stroke in '96, perhaps one in 2001, the one in 2004; those all play into her health picture, don't they?

A: Of course.

Q: And those are all – can be considered contributing factors in her ultimate death, couldn't they?

A: Yes, I think every part of her health history contributes in some way.

Although offered to rebut Dr. Schrand, who was the treating *and* attending physician in Ms. Anderson's case, it is clear from Dr. Manganaro's deposition testimony that the two doctors are in agreement as to the material fact underlying the question of coverage: Did Ms. Anderson's prior health problems contribute to her stroke and ultimate death? Both are of the opinion that Ms. Anderson's slip and fall played some undefined role in her death, but neither believe that her slip and fall was the sole cause of her death, at least to the extent the death was independent of outside factors, namely her prior health problems.

In summary, the material and undisputed evidence viewed in a light most favorable to Plaintiff illustrates that, at most, Ms. Anderson's death was caused by a combination of factors, including her fall, her health condition, and her post-operative stroke. For purposes of summary judgment, Plaintiff has not established a genuine issue for trial and as a matter of law, Plaintiff simply cannot satisfy her burden of proving that Ms. Anderson's accidental fall was the sole or even primary cause of death, independent of her preexisting medical problems. Accordingly, because Defendants' denial of coverage under the accidental death insurance policy was appropriate, summary judgment is granted as to count one of the

Complaint.

**C.    Residual State Law Claims**

In counts two through five of her original state court Complaint, Plaintiff alleges, in addition to the underlying breach of contract claim in count one, various bad faith claims in connection with Defendants' denial of coverage. An earlier Order of this Court by the presiding Magistrate Judge, pertaining to Defendants' Motion to Bifurcate, held that "if the plaintiff does not prevail on her breach of contract claim, there can be no basis for concluding that the defendant acted in bad faith." (Doc. #10, p. 3). The undersigned agrees. As stated by the Kentucky Supreme Court, "absent a contractual obligation, there simply is no bad faith cause of action, *either at common law or by statute*." *Davidson v. American Freightways, Inc.,* 25 S.W.3d 94, 100 (Ky. 2000) (emphasis added). Therefore, the Court's determination that Defendants prevail as a matter of law on Plaintiff's breach of contract claim necessitates a finding that Plaintiff's remaining counts are similarly without merit.

## IV.  CONCLUSION

In accordance with the foregoing analysis, **IT IS ORDERED** that:

(1)  Defendants' Motion for Summary Judgment (Doc. # 19) be, and hereby is, **GRANTED**;

(2)  Plaintiffs' Complaint be, and hereby is, **DISMISSED WITH PREJUDICE** and **STRICKEN** from the active docket of this Court; and

(3)  A Judgment in favor of Defendants will be entered concurrently herewith.

This 26th day of September, 2006.



Signed By:
*David L. Bunning*  DB
United States District Judge

G:\DATA\Opinions\2-05-73 Honican (MSJ MOO).wpd